**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: March 12 2010**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 08-35508 |
| | ) | |
| GOE Lima, LLC | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION REGARDING MOTION FOR APPROVAL OF DEBTOR'S ASSUMPTION AND ASSIGNMENT OF ETHANOL OFFTAKE AGREEMENT

This case is before the court on Debtor's motion for approval of its assumption and assignment of an Ethanol Offtake Agreement with BP Products North America, Inc. ("BP") pursuant to 11 U.S.C. § 365 ("Motion") [Doc. # 414], BP's opposition [Doc. # 435], and Debtor's reply [Doc. # 448]. The court held a hearing on the motion that counsel for Debtor and BP attended in person and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. This is a core proceeding that the court may hear and determine under 28 U.S.C. § 157(b)(1) and (b)(2)(A) and (O). Having considered all of the evidence, as well as the briefs and arguments of counsel, the court will deny the Motion.

**FACTS AND PROCEDURAL BACKGROUND**

Debtor filed for relief under Chapter 11 of the Bankruptcy Code on October 14, 2008. At the time of filing, it owned and operated an ethanol production facility in Lima, Ohio. As a start-up business venture, Debtor's history of operations is very limited and is intricately intertwined with its contractual relationship with BP, its only customer.

Environmental Protection Agency standards require BP to blend ethanol with the gasoline it sells to its customers. It obtains ethanol from a variety of suppliers. It is undisputed that ethanol is a generic product, that is, it is the same regardless of where it is produced in the United States. All ethanol produced in the United States is made from corn, an organic feedstock.

Although a generic product, BP carefully selects its ethanol providers. Given its commitments to customers that have long term contracts with it and its reputation in the industry, the reliability of a supplier is a major factor considered by BP in choosing a supplier. According to Mark Stiles, BP's Manager of Products and Supply in the Midwest, BP has stopped purchasing ethanol from suppliers when it perceived their supply reliability to be inadequate, even when it was necessary to purchase ethanol at a greater cost from a reliable supplier. To obtain a portion of the ethanol it required, BP entered into a five-year Ethanol Offtake Agreement with Debtor, which is dated January 17, 2006 ("the Original Agreement") [Joint Ex. 1], and which was subsequently amended on three separate occasions – on September 20, 2006 ("Amendment No. 1") [Joint Ex. 2], November 26, 2006 ("Amendment No. 2") [Joint Ex. 3], and November 20, 2007 ("Amendment No. 3") [Joint Ex. 4] (collectively, "Agreement" or "Offtake Agreement"). In choosing Debtor as a supplier, its location in Lima, Ohio, was also an important factor considered since there were no ethanol production facilities in Ohio at that time and BP had several facilities reasonably close to Lima where it blended ethanol with its gasoline.

**A. The Original Agreement**

Pursuant to the Original Agreement, Debtor was required to construct and operate a facility that would be capable of producing 56,700,000 gallons of denatured ethanol per year (the "Contract Capacity"). Under the Agreement, ethanol would be sold to BP based on a formulaic price that reimbursed Debtor for its corn and natural gas costs, which represent approximately ninety percent of Debtor's costs of production, plus an additional amount per gallon, assuring even profitability and mitigating market volatility.

Debtor had signed an agreement with Benchmark Design USA ("Benchmark") in late 2004 to be its technology provider in constructing the facility. The Benchmark technology was new and unproven with respect to the production of ethanol. By January 2006, Benchmark had built no ethanol plants that were

2

08-35508-maw    Doc 619    FILED 03/12/10    ENTERED 03/12/10 11:15:53    Page 2 of 20

operational yet. At the time the parties entered into the Original Agreement in January 2006, BP was aware of Debtor's plans to use this unproven technology. Debtor had not yet begun construction of the Lima ethanol facility, nor had it obtained the necessary financing to do so. Thus, the Agreement's provision setting forth the monthly requirements for the purchase and sale of ethanol was not effective until "the Month in which the Commercial Operation Date occurs." [Joint Ex. 1, § 3.1]. After that date, the Agreement provides that "[Debtor] shall sell, and BP shall purchase, at least ninety percent (90%) of the Monthly Contract Capacity[1]. . . ." [*Id.* at § 3.1]. "Commercial Operation Date" was defined as "the actual Day on which [Debtor] notifies BP, in writing, that the Plant is ready to produce Ethanol meeting the specifications in this Agreement at an annual production rate of at least ninety percent (90%) of Contract Capacity; provided, however, that the mutually agreed target date for Commercial Operation is December 31, 2006." [*Id.* at § 1.1.]. "Ethanol" is defined as "denatured ethanol produced primarily from organic feedstock at the Plant." [*Id.* at § 1.1].

The Original Agreement also provided that "[f]ollowing the Commercial Operation Date[,] Owner shall cause the Plant to produce Ethanol at the Contract Capacity during each year, and shall produce at least the Monthly Contract Capacity during each Month, except to the extent excused by Force Majeure." [*Id.* at § 3.1]. In addition, on and after the Commercial Operation Date, the Agreement required Debtor to "maintain a dedicated storage capacity for Ethanol at the Plant of at least one million (1,000,000) gallons solely for use in storing Ethanol to be sold to BP." [*Id.* at § 3.7]. The stated purpose of this storage is to keep a reserve for sale to BP in the event of Force Majeure. [*Id.*]. "Force Majeure" is defined as follows:

> [A]n event or circumstance that prevents a Party from performing any of its obligations under this Agreement, which event or circumstance is not within the reasonable control of, or the result of the negligence of, the Non-Performing Party, and which, by the exercise of commercially reasonable efforts, the Non-Performing Party is unable to overcome or avoid or cause to be avoided. Force Majeure does not include any accident, breakdown, shutdown or other event at or affecting the Plant which reasonably could have been avoided through the exercise by [Debtor] of Prudent Operator Practices.[2]

---

[1] "Monthly Contract Capacity" is defined as "Contract Capacity divided by three hundred fifty (350), times the number of Days in the applicable month, less the Scheduled Shutdown for such Month, provided that such monthly down time in the aggregate shall not exceed fifteen (15) Days per year." [Joint Ex. 1, § 1.1]. This definition was clarified but not changed in Amendment No. 1. [*See* Joint Ex. 2, ¶ 1].

[2] "Prudent Operator Practices" is defined in the Agreement as follows:
> [T]he practices, methods and acts which, in the exercise of reasonable professional judgment in light of the facts known at the time the decision was made, are expected to accomplish the desired result consistent with good business practices, reliability, safety and expedition. Prudent Operator Practices are intended to be professionally responsible practices, methods and acts generally accepted in the United States by operators of comparable facilities and in

3

[*Id.* at § 1.1].

Although the target for the Commercial Operation Date was December 31, 2006, the Original Agreement set forth a "Guaranteed Commercial Operation Date" of April 1, 2007. [*Id.* at § 1.1]. The Original Agreement nevertheless provided Debtor an additional 90-day period, until June 30, 2007, for the Commercial Operation Date to occur. Pursuant to § 9.4.8 of the Original Agreement, if the Commercial Operation Date did not occur by June 30, 2007, Debtor would be in default.

After the Commercial Operation Date, the Agreement required Debtor to provide BP with a monthly production plan, showing the anticipated production for each week during the month by the fifteenth day of the preceding month. Before the first of the month, BP was then required to notify Debtor as to what portion of the Monthly Contract Capacity, between ninety and one hundred percent, it would purchase during that month. [*Id.* at § 3.2]. The Agreement provides that Debtor "shall be liable to BP, in accordance with the provisions of Section 5.4.1 . . ., for direct damages for any failure to deliver nominated Ethanol up to the Monthly Contract Capacity, except as excused by Force Majeure." [*Id.* at § 3.1]. The Agreement required Debtor to construct a rail connection at its plant and required BP to take delivery of the ethanol at the plant, at its option, either at Debtor's truck loading rack or rail car siding. [*See id.* at §§ 1.1 & 3.3].

The Agreement also required Debtor to deliver an insurance commitment to BP substantially complying with the coverage requirements set forth in Exhibit 8.3.1 attached thereto "in an amount sufficient to fund [Debtor's] obligations under Sections 2.3.3, 5.1 and 5.4. . . ." [*Id.* at § 8.3.1]. Section 2.3.3 deals with Debtor's obligation to make deadline extension payments if it failed to meet certain financing deadlines, § 5.1 addresses Debtor's obligation to pay liquidated damages for delaying the Commercial Operation Date, and § 5.4 addresses its obligation to pay actual damages if it failed to deliver the volume of Ethanol nominated by BP.

Section 9.4 of the Agreement itemizes the events that would constitute a default of Debtor, only two of which are relevant to the issues before the court. In addition to a failure to reach the Commercial Operation Date by June 30, 2007, as discussed above, [*see id.* at § 9.4.8], the Agreement provides that a default occurs if Debtor "fails to perform in any material respect any obligation under this Agreement . . . and such failure is not cured within thirty (30) Days after BP notifies [Debtor] of such failure or within such longer time as is reasonable under the circumstances provided that [Debtor] commences the cure within such thirty (30) Day period," [*Id.* at § 9.4.4]. The Agreement further provides that all notices to be given under

---

  accordance with Applicable Law.
[Joint Ex. 1, § 1.1].

4

the Agreement be in writing, addressed as set forth therein, and either be personally delivered or sent by courier service, registered or certified mail, or by facsimile. [*Id.* at § 14.9]. The Agreement is governed by the laws of the state of Illinois. [*Id.* at § 14.5].

**B. Amendments to the Original Agreement**

At the time the parties entered into the first and second amendment to the Original Agreement, Debtor had not yet obtained the financing necessary to begin construction of its ethanol plant and had not yet provided BP with the required insurance commitment. Amendment No. 1, dated September 20, 2006, extended the date after which Debtor would be in default for failing to achieve the Commercial Operation Date set forth in § 9.4.8 of the Original Agreement to January 15, 2008. [Joint Ex. 2, ¶ 10]. Amendment No. 1 also amended § 3.1 of the Original Agreement to reduce Debtor's production requirement following the Commercial Operation Date from 100 percent to 85 percent of both the annual Contract Capacity and the Monthly Contract Capacity, except to the extent excused by Force Majeure. [*Id.* at ¶ 4]. And the definition of "Contract Capacity" was amended to reduce capacity from 56,700,000 to 54,000,000 gallons of ethanol per year. [*Id.* at ¶ 1].

Amendment No. 1 also amended the last sentence of the definition of "Force Majeure" to provide as follows: "Force Majeure includes any accident, breakdown, shutdown or other event at or affecting the Plant, unless such event reasonably would have been avoided through the exercise by [Debtor] of Prudent Operator Practices." [*Id.*]. Finally, Amendment No. 1 deleted Exhibit 8.3.1 attached to the Original Agreement that set forth the required insurance coverage and replaced it with a revised Exhibit 8.3.1 that requires, among other things, business interruption insurance, including "Extra Expense" coverage that covers the incremental additional cost of obtaining replacement ethanol.[3] [*Id.*, Ex. 8.3.1, ¶¶ 1.06.01 & 1.06.03].

Amendment No. 2 was entered into on November 26, 2006, in order to close the financing for the plant. The amendment clarified the timing for payment of liquidated damages for delay in the Commercial Operation Date and clarified that Debtor was the covered party under the Extra Expense insurance policy. [Joint Ex. 3, ¶¶ 1, 4]. Amendment No. 2 again amended § 9.4.8 of the Agreement to further extend the date after which Debtor would be in default for failing to achieve the Commercial Operation Date to March 1, 2008. [*Id.* at ¶ 10].

Debtor's financing was obtained and construction of the Lima plant began immediately after

---

[3] Amendment No. 1 includes additional changes to the Original Agreement, including amended versions of certain provisions for damages, that are not germane to the issues before the court.

08-35508-maw    Doc 619    FILED 03/12/10    ENTERED 03/12/10 11:15:53    Page 5 of 20

execution of Amendment No. 2. Because problems caused substantial delays in construction, one year later, the parties executed Amendment No. 3, dated November 20, 2007. [Joint Ex. 4]. According to both Gregory Krueger, who negotiated the Agreement on behalf of Debtor, and Craig Poler, who negotiated it on behalf of BP, Amendment No. 3 was entered into in order to address the concern of Debtor's lenders that Debtor would not meet the Commercial Operation Date deadline of March 1, 2008, after which Debtor would be in default and BP could terminate the Agreement. Benchmark had fallen behind schedule and, at the time of the amendment, the plant was only seventy-five percent complete. BP, therefore, once again agreed to extend the Commercial Operation Date deadline. Pursuant to paragraph three of the amendment, the date after which Debtor would be in default under § 9.4.8 of the Agreement for failing to reach the Commercial Operation Date was extended to September 1, 2008, with the following proviso:

> [I]f the Commercial Operation Date does not occur by March 1, 2008, then on and after such date, notwithstanding anything in this Agreement to the contrary, BP shall have the right to nominate and [Debtor] shall have the obligation to supply Ethanol to BP pursuant to the terms of this Agreement, and if [Debtor] fails at any time between March 1, 2008, and the earlier of the Commercial Operation Date or September 1, 2008, either to (i) at BP's election . . . supply to BP from the Plant the quantity of Ethanol nominated by BP pursuant to Section 3.1 of this Agreement from alternate suppliers arranged by [Debtor], or (ii) pay any Nondelivery Damages which [Debtor] is required to pay to BP in accordance with Section 5.4.1 of this Agreement, then BP shall have the right to terminate this Agreement if such default is not cured within seven (7) days of [Debtor's] receipt of written notice of such default from BP.

[*Id.* at ¶ 3].

In addition, paragraph four of Amendment No. 3 amended the definition of "Commercial Operation Date." The amended definition substituted "*Owner*[4] is ready to *supply* Ethanol" for "*Plant* is ready to *produce* Ethanol" and substituted "at an annual *supply* rate" for "at an annual *production* rate." [Compare *id*. at ¶ 4 with Joint Ex. 1, § 1.1 (emphasis added)]. Thus, the amended definition of "Commercial Operation Date" is "the actual Day on which Owner notifies BP, in writing, that Owner is ready to supply Ethanol meeting the specifications in this Agreement at an annual supply rate of at least ninety percent (90%) of the Contract Capacity." [Joint Ex. 4, ¶ 4]. Amendment No. 3 further provides that "Capitalized terms used in this Agreement shall have the same meaning ascribed to such terms in the Agreement, unless otherwise specifically provided herein. In the event of any inconsistency between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall govern." [Joint Ex. 4, p. 1].

**C. Performance under the Agreement**

---

[4] Debtor is referred to as "Owner" throughout the Agreement.

6

Construction of the ethanol production facility in Lima, Ohio, was completed by April 25, 2008. During the construction process, BP personnel representing various areas of expertise visited the facility at least monthly and Krueger spoke at least weekly with Poler from BP. In addition to constructing the plant so that ethanol could be loaded into BP's trucks or rail cars in the manner BP wanted, Debtor also constructed the plant so as to have an offload capability, that is, the ability to unload ethanol delivered from other facilities either by truck or rail. This capability is not a typical feature of other ethanol plants, and Debtor expended between $200,000 and $300,000 to include this feature. BP was aware of and provided input on the design of the offload capability.

Debtor began production in early May. Problems surfaced during the start up. Krueger explained that the plant consists of fifty-four different operational systems that include approximately fifteen miles of pipe ranging from a half inch to thirty-six inches in diameter, two hundred and seventy pumps and hundreds of valves. All fifty-four systems must be operating correctly in order to make the required ethanol. Reliability issues arose with a number of the processes involved in making ethanol, including the cook process, distillation, the drying process and evaporation. As a result, it was not until June that the plant was producing "on spec" ethanol, albeit not in quantities to satisfy sales to BP at ninety percent of Monthly Contract Capacity.

Nevertheless, by letter dated July 3, 2008, Debtor notified BP that it was declaring the Commercial Operation Date to be July 15, 2008. Debtor attached a production forecast indicating that it had achieved an inventory of one million gallons of ethanol on July 1 and forecasting production of approximately seventy-seven percent of Monthly Contract Capacity during the week of July 13, and an increase in production to ninety percent by the week of July 20 and ninety-six percent by the week of August 17. [*See* Joint Ex. 5; Doc. # 567, Hrg. Tr., p. 54-55]. The court credits Krueger's testimony that it was the collective decision by all those engaged in bringing the plant into full production, including over ten professional consultants on site daily, that this was a proper forecast and that, although there may be "some hiccups with equipment," the plant was capable of producing ethanol as forecasted. [Doc. # 567, Hrg. Tr., p. 56]. In addition, Krueger testified that by July 15, 2008, Debtor's storage tank, which held two million gallons, was nearly full. [Doc. # 566, Hrg. Tr., p. 188]. In preparation for the Commercial Operation Date, Debtor had also obtained commitments from other ethanol facilities and from local trucking companies to ship ethanol to Lima for delivery to BP if necessary to ensure that it could supply the amount of ethanol nominated by BP in any given month.

After Debtor's notification of the Commercial Operation Date, BP nominated ethanol purchases at

7

ninety percent of the Monthly Contract Capacity, prorated for the remainder of July, and ninety percent for August 2008. Although Debtor was able to supply the nominated ethanol to BP during July, it did so by using a portion of its stored inventory since it was producing at a rate of less than fifty percent of Monthly Contract Capacity during that time period. [*See* BP Ex. H, p. 2-3].

During the evening of July 31, 2008, the Lima plant experienced an electrical power outage that lasted three to four hours. The power failure occurred when a fifth motor on a cooling tower kicked in for the first time as the plant reached its peak load up to that time and tripped a breaker in the electrical substation. The substation is a gated, locked facility to which Debtor's personnel did not have access. Access was only available to the power company and the builder of the substation. It was ultimately determined that the cause of the power failure was that one of the breakers had a code inverted that resulted in the additional power draw being interpreted as an overload. The programming error was then corrected.

As a result of the power failure, the entire plant shut down and pipes, pumps and conveyors became plugged. Debtor notified BP of the failure, and began to systematically go through every piece of equipment in the plant to get it unplugged, a process that took days to complete. Thereafter, it individually started units up to determine whether they were damaged and to repair any damage found. On August 4, 2008, Debtor sent a letter with a revised production forecast to BP indicating that it would take approximately eight weeks to get the plant up to ninety percent capacity. Specifically, Debtor's letter stated that there would be no ethanol delivery until August 7, set forth the minimum amount it would produce from that date until September 23 (approximately fifty-nine percent of Monthly Contract Capacity), and scheduled a shutdown for repairs from September 23 to 27. Thereafter, Debtor forecasted production at ninety percent of Monthly Contract Capacity. In the interim, Debtor offered BP four options – the first two required Debtor to purchase ethanol from other suppliers for delivery to BP, the third option required Debtor to broker ethanol for BP, and the fourth required BP to obtain the additional ethanol it needed on the spot market. BP chose the fourth option.

Production during August and September was less than Debtor forecasted. Debtor used the shutdown for repairs at the end of September to deal not only with issues caused by the power failure but also preexisting reliability issues with certain equipment. Krueger testified that after the shut down period for repairs, no continuing problems stemming from the power outage were identified. Nevertheless, after the repairs were done, the plant still had capacity problems resulting from, at least in part, poor design of certain equipment. [Doc. # 567, Hrg. Tr., p. 141]. In October, after the eight-week recovery period, although Debtor had forecasted production, and BP had nominated, ninety percent of Monthly Contract

8

Capacity, Debtor's production reached only approximately sixty-nine percent. [*See* BP Ex. H, unnumbered p. 7].[5]

On October 14, 2008, Debtor was forced to file for relief under Chapter 11 of the Bankruptcy Code in order to continue its operations after secured lender SunTrust Bank swept funds from its accounts. Thereafter, Debtor continued to operate its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108. During the first ten days of November, Debtor produced ethanol at an average rate of fifty-six percent of Monthly Contract Capacity. [*Id.* at unnumbered p. 9]. However, on November 11, 2008, the plant was closed due to Debtor's inability to obtain the necessary financing to continue operations. It has produced no ethanol since. Although the market price of ethanol was higher than the contract price at the time the parties entered into the Original Agreement, there is no dispute that obtaining ethanol from alternative sources resulted in no economic harm to BP, even considering additional transportation costs, because the market price has been significantly lower than the contract price since the Commercial Operation Date.

On February 19, 2009, the court entered an order approving the sale of Debtor's assets to Paladin Ethanol Acquisition, LLC ("PEA"). [Doc. # 360]. Under the Asset Purchase Agreement ("APA"), one of the assets to be purchased by PEA is Debtor's right and interest in the Offtake Agreement. [Doc. # 328, attached Ex. A, ¶ 1(a) and (l)]. The sale order authorized the assumption and assignment of executory contracts contemplated by the APA only if "resolved consensually with the other parties to such executory contracts or as may be determined by the Court at a hearing on any proposed assumption and assignment." [Doc. # 360, p. 9]. The assumption and assignment of the Offtake Agreement, however, was not a condition precedent to closing the APA. At the time of the hearing on the instant Motion, the sale had in fact closed and there was no adjustment in the purchase price regarding the Offtake Agreement.

At the hearing, Eugene Pentimonti of PEA testified on behalf of Debtor. He is part of the "Paladin team" that overseas PEA's investment in the Lima ethanol facility. Pentimonti testified that PEA intends to engage a leading engineering, procurement, and construction contractor with experience in the ethanol industry to make the necessary repairs at the facility in order to operate it at full capacity. Although at the time of the hearing, PEA had not yet finalized an agreement with the contractor, Pentimonti testified that it was in "late stage discussions" with the contractor regarding the terms of the agreement. According to Pentimonti, under those terms, the design and construction to remediate the facility would be completed in

---

[5] Exhibit H shows the October monthly average production to be sixty-two percent of Contract Capacity. That calculation, however, does not reflect the fact that the plant was shut down for two days in October. "Monthly Contract Capacity" is defined to subtract days the plant is shutdown in determining the average monthly production rate of Contract Capacity. [*See* Ex. Joint Ex. 2, ¶ 1]

9

six to seven months, and it would then take one to two additional months of start-up time to get the facility to full production. [Doc. # 566, Hrg. Tr., pp. 59-60]. During the remediation and start-up period, Pentimonti testified that PEA would be ready and able to supply BP with ethanol from alternate suppliers in quantities required by the Offtake Agreement with delivery at the Lima facility within a couple of weeks after the assumption and assignment of the Agreement. [*Id.* at 62-63]. And finally, Pentimonti testified that capital is already allocated for the necessary repairs and that PEA is able to pay the liquidated damages owed to BP under the Agreement at the time the Agreement is assumed. [*Id.* at pp. 62, 64-65].

## LAW AND ANALYSIS

Under § 365 of the Bankruptcy Code, a trustee may assume or reject any executory contract of the debtor. 11 U.S.C. § 365(a). This enables the trustee "'to maximize the value of the debtor's estate by assuming executory contracts ... that benefit the estate and rejecting those that do not.'" *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3rd Cir. 2001) (quoting *L.R.S.C. Co. v. Rickel Home Centers (In re Rickel Home Centers, Inc.)*, 209 F.3d 291, 298 (3rd Cir. 2000)). However, if there has been a default in the contract, the trustee may not assume the contract unless, at the time of assumption, the trustee cures, or provides adequate assurance that the trustee will promptly cure, such default and provides adequate assurance of future performance. 11 U.S.C. § 365(b)(1). The cure and adequate assurance requirements of § 365(b)(1) apply to both monetary and non-monetary defaults. *See Cal Worthington v. General Motors Corp. (In re Claremont Acquisition Corp.)*, 113 F.3d 1029 (9th Cir. 1997); *In re New Breed Realty Enter., Inc.*, 278 B.R. 314, 321 (Bankr. E.D.N.Y. 2002); *In re Empire Equities Capital Corp.*, 405 B.R. 687, 690-91(Bankr. S.D.N.Y. 2009). Once the trustee assumes an executory contract, § 365 also authorizes assignment if he provides adequate assurance of future performance by the assignee. *See* 11 U.S.C. § 365(f). Subject to exceptions that do not apply here, a debtor in possession has all the rights, powers and duties of a trustee, 11 U.S.C. § 1107(a), including those under § 365, *COR Rout 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 378-79 (2nd Cir. 2008).

A debtor in possession moving to assume a contract has the ultimate burden of persuasion that the contract is one subject to assumption and that all requirements for assumption have been met. *In re Rachels Indus.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990). However, the objecting party, in this case BP, has the initial burden of showing a default. *See id.* If a default is established, then the burden shifts back to the debtor to provide satisfactory proof that the defaults have either been cured or will be promptly cured and that there is adequate assurance of future performance. *Id.* To the extent that a default is not demonstrated, the cure and other stated requirements of §365(b)(1) do not come into play.

10

In determining whether a debtor should be allowed to assume an executory contract under § 365(a), courts initially apply a "business judgment" and "benefit to the estate" test. *See In re Penn Traffic Co.*, 524 F.3d at 382 (citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2nd Cir. 1993)). BP has not objected to the assumption based on a claimed failure to meet that test. Rather, its objection is premised on the claimed existence of non-monetary defaults that cannot be cured. Specifically, BP argues that Debtor defaulted by failing to achieve the Commercial Operation Date by September 1, 2008, as required by Amendment No. 3. Alternatively, BP argues that if the Commercial Operation Date was achieved, Debtor defaulted by failing to comply with the production requirements following that date as required by § 3.1 of the Agreement. Finally, BP objects to assignment of the Agreement, arguing that PEA cannot provide adequate assurance of future performance. For the reasons that follow, the court finds that BP has not met its burden of showing that a default exists under the terms of the Agreement and, therefore, that the cure requirements of § 365(b)(1) apply. Nevertheless, the court also finds that Debtor may not assign the Agreement since it has not met its burden of demonstrating adequate assurance of future performance as independently required under § 365(f)(2).

## I. Debtor Has Not Defaulted Under the Terms of the Agreement

In determining whether a default exists under a contract, the court must look to state law, which, in this case, is Illinois law. *In re Rachels Indus.*, 109 B.R. at 803-04. Under Illinois law, the court's primary objective in construing the provisions of a contract is to give effect to the intent of the parties, which is determined from the final agreement executed by them rather than from preliminary negotiations and the construction placed upon the agreement by the parties. *Pennsylvania Life Ins. Co. v. Pavlick*, 265 Ill. App. 3d 526, 529 (1994); *Hickox v. Bell*, 195 Ill. App. 3d 976, 989-990 (1990). When the terms of the contract are clear and unambiguous, the parties' intent must be ascertained solely from language of the contract itself. *Pavlick*, 265 Ill. App. 3d at 529. "Meaning and effect must be given to every term and provision, if possible, since it is presumed that every clause in the contract was inserted deliberately and for a purpose and that the language was not employed idly." *River Plaza Homeowner's Ass'n v. Healey*, 389 Ill. App. 3d 268, 277 (2009). In doing so, the court must give the terms their ordinary and natural meaning. *Pavlick*, 265 Ill. App. 3d at 529.

### A. Commercial Operation Date

BP contends that Debtor was in default for failing to achieve a Commercial Operation Date by September 1, 2008, as required by § 9.4.8 of the Agreement, as amended by Amendment No. 3. According to BP, this provision, together with the definition of "Commercial Operation Date," required Debtor to be

11

producing ethanol at ninety percent of Contract Capacity by September 1, 2008. Although Debtor declared a Commercial Operation Date of July 15, 2008, there is no dispute that it never actually achieved a production rate before September 1 that would yield ninety percent of Contract Capacity.

Nevertheless, Debtor argues that the Agreement required only that Debtor be ready to *supply* ethanol at a rate of ninety percent of Contract Capacity. When it declared a Commercial Operation Date of July 15, 2008, Debtor argues that its management and consultants reasonably believed that the plant would be ready to produce ethanol sufficient to achieve an annual supply rate of ninety percent of Contract Capacity but that it anticipated some equipment problems that it would still have to address and so had obtained commitments from other ethanol facilities and trucking companies to ensure that it could supply the required ethanol in any given month. Thus, it contends that it achieved the Commercial Operation Date within the time constraints of the Agreement. The court agrees.

The parties' dispute centers primarily around the proper interpretation of "Commercial Operation Date." As defined in Amendment No. 3, "Commercial Operation Date" is "the actual Day on which Owner notifies BP, in writing, that Owner is ready to supply Ethanol meeting the specifications in this Agreement at an annual supply rate of at least ninety percent (90%) of the Contact Capacity." [Joint Ex. 4, ¶ 4]. This amended definition made very specific changes to the original definition. As noted earlier, the amended definition substituted "*Owner* is ready to *supply* Ethanol" for "*Plant* is ready to *produce* Ethanol" and substituted "at an annual *supply* rate" for "at an annual *production* rate." "Supply" and "produce" are not synonymous. "Supply" is defined as "to furnish with what is wanted," while "produce" is defined as "to make, originate, or yield." Black's Law Dictionary 1209, 1439 (6th ed. 1990). In addition, reference to the plant was removed from the definition. Assuming that the parties deliberately substituted "Owner" for "Plant" and "supply" for "produce" and "production" and that these terms were not employed idly, the court finds the Agreement clearly and unambiguously requires only that Debtor be ready to supply, or furnish, ethanol, rather than the Plant being ready to produce ethanol, at the required rate on the Commercial Operation Date. In so finding, the court relies solely on the language of the Agreement. It does note, however, that this interpretation is consistent with BP's input in designing, and Debtor's construction of, the offload capability of the plant, a feature that is not typical of other ethanol plants.

The court does not believe that the parties' use of the defined terms "Ethanol" and "Contract Capacity" in the Commercial Operation Date definition requires a different interpretation. "Ethanol" is defined in the Agreement as "denatured ethanol produced primarily from organic feedstock *at the plant*." [Joint Ex. 1, ¶ 1.1 (emphasis added)]. The court, however, does not find that definition, which is found in

12

the Original Agreement, particularly helpful in interpreting the amended definition of Commercial Operation Date. BP argues that "Ethanol" is defined as being produced "at the plant," and, therefore, that the Agreement requires Debtor to supply ethanol produced at the plant. However, it is not clear whether "primarily" in the definition of Ethanol modifies "from organic feedstock" or "at the plant." The testimony at the hearing indicates that all ethanol produced in the United States is produced from the organic feedstock, corn. Thus, it appears that "primarily" modifies "at the plant" and permits at least some ethanol to be supplied from alternate suppliers. In any event, to the extent that there is ambiguity in the definition of "Ethanol," the court does not believe use of the term "Ethanol" renders the definition of Commercial Operation Date ambiguous given the specific and deliberate modifications in the definition as discussed above. Those changes would otherwise be rendered meaningless. The court also notes that in the paragraph immediately preceding the amended definition of Commercial Operation Date in Amendment No. 3, the parties use the term "Ethanol" in a manner clearly intended to refer to ethanol obtained from an alternate supplier.[6] And to the extent that there is an inconsistency between the definition of "Ethanol" in the Original Agreement and its use in Amendment No. 3, the provisions of the amendment govern. [*See* Joint Ex. 4, p. 1].

"Contract Capacity" is defined as an "annual *production* volume of 54 million gallons of denatured ethanol." [Joint Ex. 2, ¶ 1 (emphasis added)]. While this definition is in terms of a production volume, its use in the definition of Commercial Operation Date is simply to designate the amount of ethanol that Debtor must supply – i.e. "at a supply *rate* of at least ninety percent (90%) of the Contract Capacity." Moreover, the Agreement itself does not require that Debtor actually produce that volume of ethanol annually. The Agreement specifically provides that Debtor need only produce eighty-five percent of the Contract Capacity each year following the Commercial Operation Date. [*Id.* at ¶ 4]. Thus, the amended definition of Commercial Operation Date requiring Debtor to be ready to supply ethanol, which may include ethanol from alternate suppliers, at an annual rate of eighty-five percent of Contract Capacity, is consistent with the lesser production requirement set forth elsewhere in the Agreement.[7]

---

[6] In amending § 9.4.8 of the Agreement, paragraph 3 of Amendment No. 3 sets forth BP's right to terminate the Agreement "if Owner fails at any time between March 1, 2008 and the earlier of the Commercial Operation Date or September 1, 2008 either to (i) at BP's election . . . supply to BP from the Plant the quantity of *Ethanol* nominated by BP . . . *from alternate suppliers arranged by Owner*. . . ." [Joint Ex. 4, ¶ 3 (emphasis added)].

[7] BP states that the difference between the ninety percent of Contract Capacity required to be supplied and the eighty-five percent annual production requirement could be made up by Debtor supplying ethanol that it has stored as inventory. However, the difference between ninety percent of Contract Capacity (.9 x 54 million=48.6 million) and eighty-five percent of Contract Capacity (.85 x 54 million=45.9 million) is 2.7 million gallons of ethanol, while Debtor's storage capacity is only 2 million gallons.

13

Nevertheless, BP argues also that an interpretation that permits Debtor to supply BP with ethanol from alternate suppliers is inconsistent with the provisions of § 5.4 and § 9.4.8 of the Agreement specifically giving BP the right to elect to obtain ethanol from such suppliers. The court disagrees. Section 5.4 of the Agreement provides that Debtor is liable for cover and incidental damages in the event it fails to deliver the volume of ethanol nominated by BP and BP elects to procure ethanol from alternate sources. Amended § 9.4.8 provides that BP had the right to nominate an amount of ethanol and that Debtor had the obligation to supply such ethanol after March 1, 2008, even though the Commercial Operation Date had not occurred. That section further provided that, between March 1, 2008, and the earlier of the Commercial Operation Date or September 1, 2008, BP had the right to terminate the Agreement if it elected to have Debtor supply it with ethanol from an alternate supplier and Debtor failed to do so or failed to pay non-delivery damages. Thus, BP's right of election under § 9.4.8 terminated on the Commercial Operation Date. Neither BP's right of election under § 9.4.8, nor its ability under § 5.4 to elect to procure ethanol from alternate suppliers in the event Debtor fails to deliver the ethanol that BP nominates, is inconsistent with Debtor's ability to supply ethanol from alternate suppliers.

The court finds that, as of July 15, 2008, Debtor was ready to supply BP with ethanol at a rate of ninety percent of the Contract Capacity. Although Debtor anticipated having to deal with certain equipment issues, it was prepared to do so while continuing to supply ethanol as required, having obtained commitments from other ethanol facilities as well as trucking companies to ensure its ability to do so. Debtor not only was ready to supply ethanol at the required rate, it also determined, with the agreement of numerous consultants, that it had the ability to produce ethanol at an annual rate of ninety percent of Contract Capacity. The court notes that "Commercial Operation Date" is defined in terms of an annual rate, and not a daily or monthly rate. While Debtor was admittedly continuing to deal with equipment issues, BP has failed to meet its burden of showing that Debtor was not ready to supply it with the required amount of ethanol. And the fact that unforeseen circumstances arose later and interfered with Debtor's continued performance under the Agreement does not negate the fact that the Commercial Operation Date occurred on July 15, 2008, as declared by Debtor.

### B. Eighty-five Percent Production Requirement

Section 9.4 of the Agreement specifically defines events of default. Under § 9.4.4, Debtor is in default if it "fails to perform in any material respect any obligation under [the] Agreement . . . and such failure is not cured within thirty (30) Days after BP notifies [Debtor] of such failure or within such longer time as is reasonable under the circumstances provided that [Debtor] commences the cure within such thirty

14

(30) Day period," [Joint Ex. 1, § 9.4.4]. To show that a default exists under this provision, BP must show not only that Debtor failed to perform but also that BP provided proper notice of such failure and that Debtor failed to cure within thirty days or within a reasonable time under the circumstances. *Cf. In re Greektown Holdings, L.L.C.*, No. 08-53104, 2009 Bankr. LEXIS 1231, *8, 2009 WL 1653461, *2 (Bankr. E.D. Mich. May 13, 2009) (construing a similar default provision as requiring proper notice for a default to have occurred under the agreement).

BP invokes § 9.4.4 of the Agreement and argues that Debtor is in default for failing to comply with its obligation under amended § 3.1 of the Agreement, which requires Debtor to cause the plant to produce ethanol at not less than eighty-five percent of the Monthly Contract Capacity after the Commercial Operation Date. This production requirement is separate and distinct from the requirement that Debtor be ready to supply ethanol at an annual rate of ninety percent of Contract Capacity. There is no dispute that Debtor did not comply with the production requirement after the Commercial Operation Date, its production having reached only approximately sixty-nine percent of Monthly Contract Capacity by the end of October and Debtor having produced no ethanol at all since November 11, 2008. Nevertheless, Debtor offers three arguments in response – (1) its failure to produce ethanol at the required rate is not a material default and, therefore, should not prevent it from assuming the Agreement; (2) Debtor's performance was excused by a contractual Force Majeure in the July 31, 2008, power failure; and (3) BP did not provide proper notice of Debtor's failure to perform as required under § 9.4.4 of the Agreement. The court addresses each of Debtor's arguments below.

### 1. Materiality

Debtor argues that because ethanol is a generic product and because BP suffered no economic harm as a result of Debtor's failure to produce ethanol at the eighty-five percent rate, any default in performance of its obligations under § 3.1 is not material. BP counters that the production requirement is material as it goes to the essence of the bargained-for exchange, that is, that Debtor build an ethanol production facility from which BP could obtain a reliable supply of ethanol.

Courts employ a "material or economically significant" standard to determine whether a non-monetary, non-curable default is sufficient to preclude assumption of a contract. *In re New Breed Realty Enter., Inc.*, 278 B.R. at 321 (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3rd Cir. 1990)); *In re Chapin Revenue Cycle Mgmt, LLC*, 343 B.R. 728, 731 (Bankr. M.D. Fla. 2006); *In re Lee West Enter., Inc.*, 179 B.R. 204, 208-09 (Bankr. C.D. Cal. 1995) (concluding that a non-curable default consisting of the closure of an automobile dealership for more than seven days was of "sufficient substance" to preclude

15

assumption of franchise agreement); *see In re Fleming Co.*, 499 F.3d 300, 305-06 (3rd Cir. 2007) (applying a "material and economically significant" standard to determine whether adequate assurance of future performance of a provision of a contract need be given). In applying this standard, the Third Circuit explained that "'a bankruptcy court . . . must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain.'" *In re Fleming Co.,* 499 F.3d at 305 (citing *In re Joshua Slocum Ltd.*, 922 F.2d at 1091). Thus, resolution of the materiality issue "does not depend on whether a term is 'economically material.' Rather, the focus is rightly placed on the importance of the term within the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance)." *Id.* at 306.

In *In re Fleming Co.*, a contract required the debtor to supply supermarket products to Albertson's from the debtor's Tulsa distribution center. The debtor moved to assume and assign the contract to a third party that would supply the same products at the same price but from distribution centers in Oklahoma City and Kansas City. *Id.* at 303. Albertson's opposed the motion, arguing that supply from the Tulsa facility was a key element in the bargain between Albertson's and the debtor. *Id.* Although supply from the Tulsa facility did not have manifest material and economic significance, the Third Circuit concluded that because the contract arose from the debtor's acquisition of the Tulsa facility, "it is clear that the parties considered supply from that facility to be 'material' in the sense that the express condition was an integral part of the agreement." *Id.* at 307. The court further found that not utilizing the Tulsa facility "would burden Albertson's in an 'economically significant' way – that is, Albertson's would not reap the benefit of its bargain." *Id.* The court explained that "[n]ot only did Albertson's expect timely delivery of foodstuffs at agreed-upon prices. . . but it also bargained for the benefits of expedience, of a trained staff, a consistent supply of products, and a proven electronic system of recordkeeping. . . ." *Id.* The court, therefore, denied the motion to assume and assign the contract. *Id.*

Applying the standard as set forth in *In re Fleming Co.*, this court finds that the eighty-five percent production requirement in the Agreement is both material and economically significant. The Agreement centered around Debtor building an ethanol production facility. The parties clearly considered the eighty-five percent production requirement in amended § 3.1 of the Agreement to be material in that it was a bargained-for provision, as is obvious from the fact that it was specifically amended from the original requirement of production of one hundred percent of Monthly Contract Capacity. While materiality of the provision itself "precludes the court from treating compliance as insignificant in the assumption process,"

16

*In re New Breed Realty Enter.,* 278 B.R. at 324, the court also finds that the provision is economically significant – that is, that BP "would not reap the benefit of its bargain" if the provision were ignored, *In re Fleming Co.*, 499 F.3d at 307. BP not only bargained for delivery of ethanol at Debtor's facility at agreed upon prices, but also for the benefit of a reliable source of ethanol, a benefit critical in BP choosing a supplier.

### 2. Force Majeure

Debtor next asserts that its performance under amended § 3.1 of the Agreement was excused as a result of the July 31, 2008, power failure at its plant. Debtor has the burden of proving that its performance under the Agreement is excused. *S.N.A. Nut Co. v. Haagen-Dazs Co. (In re S.N.A. Nut Co.)*, 247 B.R. 7, 17 (Bankr. N.D. Ill. 2000) (applying Illinois law).

Amended § 3.1 obliges Debtor to cause its plant to produce ethanol at eighty-five percent of the Monthly Contract Capacity during each month, "except to the extent excused by Force Majeure." [Joint Ex. 2, ¶ 4]. And § 7.1 provides that "[a] party shall be excused from its performance under this Agreement, other than the obligation to pay money due, to the extent caused by Force Majeure." [Joint Ex. 1, § 7.1]. "Force Majeure" is defined in the Agreement to mean "an event or circumstance that prevents a Party from performing any of its obligations under [the] Agreement, which event or circumstance is not within the reasonable control of, or the result of the negligence of, the Non-Performing Party, and which, by the exercise of commercially reasonable efforts, the Non-Performing Party is unable to overcome or avoid or cause to be avoided." [Joint Ex. 2, ¶ 1]. The Agreement specifically defines "Force Majeure" to include "any accident, breakdown, shutdown or other event at or affecting the Plant, unless such event reasonably would have would have been avoided through the exercise by [Debtor] of Prudent Operator Practices." [*Id.*].

In this case, although the power failure at the plant caused a complete shutdown of the plant for only three to four hours, the effects of the sudden shutdown on the machinery at the plant significantly impaired Debtor's ability to produce ethanol as it originally forecasted. The cause of the power failure was a programming error in which one of the breakers in the electrical substation had a code entered that was inverted. Access to the substation was only available to the power company and the builder of the substation. The court finds that this event was not within the reasonable control of, or the result of the negligence of, Debtor. Nor is there any suggestion that Debtor could have avoided the shutdown through the exercise of Prudent Operator Practices.

Having found that an event constituting a Force Majeure occurred, the question remains for what period of time that event excused Debtor's performance under the Agreement. The court credits Krueger's

17

testimony regarding the painstaking process of unplugging every piece of equipment and determining whether there was damage and repairing any damage found. The court also credits his testimony regarding the difficulty restarting the machinery after the sudden shutdown and the need to repair lingering damages during the shutdown at the end of September. Debtor's management estimated an eight week recovery period, which the court finds was reasonable. As such, the court finds that Debtor's performance under the Agreement was excused until at least September 30, 2008. After that time, Krueger testified that no continuing problems stemming from the power outage were identified. Debtor's performance was, therefore, no longer excused after September 30. And Debtor's performance was certainly not excused after it closed the plant on November 11, 2008. The closure was the result of Debtor's inability to obtain the financing required to maintain operations, and not the result of the power outage.

### 3. Notice Under § 9.4.4 of the Agreement

Debtor also argues that no default under § 9.4.4 has occurred since BP has not provided the required notice of Debtor's failure to perform under the Agreement. As discussed earlier, for BP to meet its burden of showing a default under the Agreement, it must show not only that Debtor failed to perform but also that BP provided Debtor proper notice of such failure. [*See* Joint Ex. 1, § 9.4.4.]. The Agreement provides that "all notices . . . to be given or made under this Agreement will be in writing, . . . and will either be personally delivered or sent by courier service, by registered or certified mail, or by facsimile." [*Id.*, § 14.9].

When asked whether BP had provided notice of the defaults claimed by BP to have occurred, Stiles testified that he believed a letter was sent but that he could not remember exactly what was said in the letter. [Doc. # 566, Hrg. Tr., pp. 130-31]. Only two letters properly addressed to Debtor from BP are in evidence – one is dated August 13, 2008, and the other is dated September 15, 2008.[8] [BP Exs. B & C]. Stiles describes both letters as being sent in order to challenge the fact that the Commercial Operation Date had occurred, not to notify Debtor of its failure to produce at a monthly rate of eighty-five percent of the Monthly Contract Capacity as required under § 3.1 of the Agreement. Nevertheless, the final paragraph of the September 15 letter states as follows: "As GOE's historical performance to date is substantially below the Monthly Contract Capacity as required by the Agreement, BP will not nominate any of its Monthly Purchase Nomination for the month of October."[9] [BP Ex. C]. To the extent that this constitutes notice of

---

[8] There is no testimony or other evidence as to whether either letter was delivered in the manner required under § 14.9 of the Agreement.

[9] After further correspondence with Debtor, BP reconsidered its decision and did, in fact, nominate for the month of October.

18

a failure to perform under § 3.1 of the Agreement, the court finds it insufficient to meet the notice requirement of § 9.4.4 since the letter was sent at a time during which Debtor's performance was excused due to the power outage as discussed above. The record is silent as to any further notice being provided as required under the Agreement. Because the Agreement specifically defines a default under § 9.4.4 to include a failure to cure after notice of a failure to perform a material obligation is provided by BP, the court finds that BP has not met its burden of showing the existence of a default under that section. As a result, the cure and other requirements of § 365(b)(1) are not in issue. Debtor would be permitted to assume the Offtake Agreement if there is a benefit to the estate in doing so, an issue that in turn depends on whether it can be assigned to PEA.

**II. Debtor Has Not Provided Adequate Assurance of PEA's Performance Under the Agreement**

Under § 365(f), a debtor may assign an executory contract only if it assumes the contract and "adequate assurance of future performance by the assignee of such contract . . . is provided, whether or not there has been a default in such contract. . . ." 11 U.S.C. § 365(f)(2). The Bankruptcy Code does not define the phrase "adequate assurance of future performance" as used in both § 365(b)(1) and § 365(f)(2). *See In re Fleming Cos.*, 499 F.3d at 305. Based on legislative history, courts have turned to the Uniform Commercial Code for guidance as to the meaning of adequate assurance of future performance. *See Cinicola*, 248 F.3d at 120 n.10; *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985). The Uniform Commercial Code considers the adequacy of assurance to be based on commercial reasonableness; as such, courts have held that the phrase "adequate assurance of future performance " was intended to be given a practical, pragmatic construction. *See, e.g., Cinicola,* 248 F.3d at 120 n.10; *Richmond Leasing*, 762 F.2d 1309-10; *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Generally, adequate assurance is considered to be something less than an absolute guarantee and will be "adequate if performance is likely (i.e. more probable than not)." *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999). The particular facts and circumstances of each case will determine what constitutes adequate assurance. *See id.* at 602; *In re Carlisle*, 103 B.R. at 538. While adequate assurances need not be given for every term of an executory contract, *In re Fleming Co.*, 499 F.3d at 305, "[n]either the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party," *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995).

In this case, the facts and circumstances of the assumption and assignment of the Offtake Agreement must be evaluated to determine whether BP has been provided with adequate assurance of future performance as required by § 365(f)(2). Debtor seeks to assign the Agreement to PEA. It offered evidence

19

that, at the time of the hearing, PEA had capital allocated for necessary repairs at the Lima facility, that remediation of the facility would be completed in six to seven months, and that it would take an additional one to two months of start-up time to get the facility into full production. In the meantime, the PEA representative testified that it would supply ethanol to BP at the Lima facility that it would obtain from alternate suppliers. However, this evidence fails to provide adequate assurance of the obligation under the Agreement to produce ethanol at a monthly rate of eighty-five percent of the Monthly Contract Capacity, an obligation PEA admittedly would not have been capable of performing at the time of the hearing and would not have been capable of performing for at least seven to nine months after remediation of the facility began. Given the troubled operational history of the facility and the substantial scope of the changes in the production technology contemplated by PEA, the court cannot find from the evidence that it is more probable than not that PEA will be able to meet the production obligation. As discussed above, this term of the Agreement is material and economically significant and was not written out of the Agreement simply by defining Commercial Operation Date in terms of supply rather than production. Adequate assurance that PEA will fulfill this contractual obligation is required under § 365(f)(2) but was not provided by Debtor. As such, assignment to PEA is not permitted.

## CONCLUSION

Debtor is not entitled to assign the Agreement under § 365(f)(2), having failed to provide adequate assurance of PEA's future performance under the Agreement. And although the cure requirements of § 365(b)(1) do not apply since no default has been shown to exist, because the Lima facility has already been sold, Debtor's assumption of the Agreement would be an unwarranted burden and of no benefit to the estate. Debtor's motion for approval of the assumption and assignment of the Agreement will, therefore, be denied. A separate order in accordance with this Memorandum of Decision will be entered.